**L. L. BROWN PAPER CO. v. HYDROIL-
OID, Inc., et al.**

District Court, S. D. New York.
Dec. 30, 1939.

Emery, Varney, Whittemore & Dix, of New York City (N. M. Sandoe and L. E. Varney, both of New York City, of counsel), for petitioner.

Swiger, King & Chambers, of New York City (Frank Delaney, of New York City, of counsel), for respondents Hydroiloid, Inc., and others.

Cravath, deGersdorff, Swaine & Wood, of New York City, for respondents Lee.

HULBERT, District Judge.

This is a civil action brought under the Declaratory Judgment Act, Judicial Code, Sec. 274d, 28 U.S.C.A. § 400, and tried without a jury.

It is conceded that the court has jurisdiction both as to parties and subject matter.

Petitioner was incorporated in Massachusetts; Hydroiloid Incorporated, in New York; Verwaltungs-und Reorganisations A. G. Schwyz, in Switzerland; Herman Scherbak is a citizen of Czechoslovakia; Ronald C. Lee and Joseph D. Lee are citizens of the United States, and all three of the individual defendants are residents of this district.

The court will undertake to state briefly the nature of this action and then discuss the facts upon which its disposition turns.

Exportingenieuere fur Papier-und Zellstofftechnik, G. M. B. H., incorporated in Germany, with its principal place of business in Berlin, and hereinafter called the "Parent Company" owned and controlled German patents and had other patent applications pending both in Germany and the United States of America, covering a secret process claimed to be the invention of one Alfred Lutz.

By a written agreement dated June 11, 1921, the Parent Company assigned to Joseph D. Lee (and others whose interest was acquired by his brother Ronald C. Lee)

"All its rights of every nature and description in and to said process so far as same applies to use in the United States of America, which rights include the right to sell, manufacture, license and generally deal in and with said process and its application to all products made wholly or partly of paper * * *".

Hydroiloid Incorporated was organized pursuant to the agreement of June 11, 1921, to take over and develop the American rights to the secret process. One-half of the shares of its capital stock, issued to Lee Associates, was transferred to Scherbak, who became a director and vice-president. The other directors were Joseph D. Lee, Ronald C. Lee and James H. Ward.

This action was dismissed, upon the trial, as to Ward, who had not been served with process.

At a meeting of the board of directors of Hydroiloid Incorporated, held on April 1, 1925, a resolution was adopted reciting that Scherbak had given his services to the company beyond his obligation and that he had stated he could not "guarantee any genuine development" without assurance that the work started by him, with the assistance of Mr. J. D. Lee, would be continued in the same manner for the next twelve months, which the resolution was designed to insure.

On October 13, 1925, Hydroiloid Incorporated addressed a communication to the Parent Company and Scherbak, reading as follows: "For your putting special efforts in the development of our company and taking over for 4 weeks expenses of $125 per week out of your pocket we agree that from the first 3 license contracts made during these 4 weeks you receive 75% of any money or other value out of such contracts for the whole life of these contracts or their extensions or substitutes to same time and value as received and this letter to be considered as irrevocable assignment of these 75%. The remaining 25% go to the treasury of our company exclusively to be used to cover further expenses of the companie or yearly dividends. The undersigned waive their right to draw 70% of these 25% for their expenses and consulting services under present arrangement and will not contest this present agreement in any case. This agreement does not apply to any contract with the Union Bag and Paper Co. or Menasha Printing and Carton Co. You can arrange the license contracts in our name as you best will as you see fit. If monopolies are

given any money above $15,000 a year goes to our company for regular distribution of 70% for consulting and 30% to the treasury."

Petitioner owned and operated a paper mill at Adams, Massachusetts.

Scherbak, acting on behalf of Hydroiloid Incorporated, opened negotiations with petitioner, resulting in an agreement dated November 9, 1925, the details of which will be later set forth, whereby Hydroiloid Incorporated granted to petitioner a license permitting the use of the secret process for the treatment of rag paper.

When the Parent Company had received at least $50,000 in royalties[1] and Hydroiloid Incorporated owed debts in excess of that amount, Ronald C. Lee proposed the suspension of royalty payments until the debts were liquidated. Scherbak declined to accede. An assignment by Hydroiloid Incorporated for the benefit of its creditors, pursuant to the New York Debtor and Creditor Law, followed, its assets were sold at public auction and bought in by Ronald C. Lee, to whom payments of royalties were thereafter made and Letters Patent No. 1,682,390 were issued on April 28, 1928, on the application filed in the name of Alfred Lutz, March 29, 1921, Serial No. 456,759.

On November 5, 1930, an adjustment between the respondents (other than the Swiss Company, which had not yet become an interested party) was effected; mutual releases were exchanged; Lee's title as purchaser of the assets of Hydroiloid Incorporated was confirmed; the disposition of royalties paid and to be thereafter collected was settled and Lee assigned the patent which by other mesne assignments ultimately became the property of the Swiss Company.

Scherbak, who had been in Europe since December 2, 1927, wrote petitioner on January 8, 1931, advising of his arrival in New York, and stated:

"I should be pleased to let you have the result of further developments in the Hydroiloid process made during the last years on the other side of the ocean. I am here for a very short time only and would therefore suggest to let me know by telephone when it will be convenient for you to see me.

"The affairs with Messrs. Lee have been settled without legal procedure. I am very pleased about it."

There was occasional contact between Scherbak and petitioner from then on, sometimes friendly, at other times provocative, irritating and annoying, until May, 1938, when petitioner was notified by Hydroiloid Incorporated and the Swiss Company that the license agreement was cancelled.

Petitioner thereupon brought this action seeking:

1. A confirmation of its license

2. An adjudication that it had properly accounted thereunder, and

3. For a determination of the rights and interest of the respondents.

The Swiss Company, Hydroiloid Incorporated and Scherbak set up various defenses and a counterclaim for $1,000,000 against the respondents Lee and pray a confirmation of the title, ownership and proprietorship of U. S. Letters Patent No. 1,682,390 and the Hydroiloid process and all of the assets formerly of Hydroiloid Incorporated in the Swiss Company.

Ronald C. Lee and Joseph D. Lee assert a cross-counterclaim against their co-respondents for damages in the amount of royalties alleged to have been lost by them by reason of the acts of those respondents.

In the license agreement dated November 9, 1925, Hydroiloid Incorporated is described as "proprietor" and the petitioner as "licensee", the terms of which provided, inter alia:

"Whereas, the Licensee desires as far as possible:
(1) To increase the dry strength without change of furnish and in sizing generally.
(2) To increase the folding properties on bond, linen, ledger, document and banknote papers.
(3) To improve erasing surface.
(4) To make paper perspiration proof.
(5) To make paper water and oil resistent.
(6) To improve for embossing.
(7) To improve for registering
(8) To size blue and brown print and photographic papers.
(9) To improve against forging.
(10) To obtain desired sizing results for specialties.
  ∗      ∗      ∗      ∗      ∗      ∗

---

[1] Royalties from other licenses issued in addition to Brown's contributed to this sum but were all terminated (except petitioner's) before the sale to Lee by the state court assignee of Hydroiloid Incorporated.

"Hydroiloid, Incorporated warrants:

"First: That the statements, regarding the samples hereinafter mentioned are correct and that it has the right to issue licenses under this process for the United States.

"The Proprietor further guarantees that the samples attached to this contract are manufactured by the Hydroil Process and that the quality of these samples can be repeated in the presence of the expert of the Licensee.

"Second: The Proprietor will, against the first payment, admit the expert of the Licensee to its laboratory in New York and permit the Licensee to copy any part of the machinery or the process for the purpose of this contract. The Proprietor will further give advice on any question as to the working and application of the process on machinery and laboratory scale, and will instruct the licensee in the proper carrying out of the process at its place of business or in writing, and will supervise the erection of Hydroiloid machinery in the mill of the Licensee, traveling expenses to be refunded. The Proprietor shall have access to the plant of the Licensee if working on Hydroil products for the purpose of assisting in the carrying out of the process.

"The Licensee agrees that the process shall be disclosed only to persons to whom the disclosure is necessary and that the disclosure shall be coupled with an agreement on their part to keep it confidential and to make no unauthorized use thereof and to deliver any improvements they may make exclusively to the Licensee. It will take reasonable precautions to prevent the discovery of the process by others.

"Third: The license issued under this agreement extends to three United States patent applications now filed as follows: Serial No. 456,759–1921, No. 54725–1925, and No. 54726–1925; and to any future applications which may be filed by the Proprietor or Inventor and to all United States patents which may be issued on said applications relating to the subject matter of this contract. Further, to a trade mark covering 'Hydroloid' papers of 1921. The validity of such patents shall not be contested by the Licensee. Improvements made by either party on the process, or such improvements as may come into their possession may be used by the Licensee to the extent of its license, specified below. For any other uses, they are the exclusive property of the proprietor and the Inventor.

Samples and testimonials will be exchanged between the parties.

"The words 'Hydroil Process' as used in this contract mean an improved process on sizing paper and similar tissues, the results of which are shown in the attached samples. The word 'Process' includes in its meaning also any application or improvement using any of the essential elements of the described process, or machinery used in connection therewith by either party. The Licensee agrees that he has not yet been able to produce the paper qualities shown.

"Fourth: The licensor, by this contract, grants to the licensee the exclusive right to use the process referred to herein for the treatment of writing paper selling by the manufacturer for twenty cents (20¢) or more per pound, and the exclusive right to use and sell such paper in the United States.

"Fifth: Towards the large expense which the Proprietor has had during the many years spent in developing this process, erecting a machine, etc., the Licensee will pay Six Thousand ($6,000) Dollars on the signing of this contract against a written description of the process. The Licensee shall pay royalties quarter yearly of $20 per ton of 2,000 pounds of papers treated and sold according to the Process.

"The Licensee shall keep records showing the Proprietor the amount and kind of papers treated. All processed paper or products shall be sold under trade names which shall include the registered words 'Hydroil' or 'Hydroiloid' as a part. It is optional with the Licensee to use these names in its watermarks. The license granted hereunafter shall not be assigned by the Licensee.

"Sixth: With the consent of the Licensee and not otherwise, other licenses may be granted in this field. In such case a minimum cash payment of $10,000 must be paid by such other Licensee to this Licensee and a yearly minimum of $5,000 on a royalty basis of not less than $25 a ton. All income out of such other licenses shall be divided when and as received 40% to the Licensee and 60% to the Proprietor.

"Seventh: The Licensee has the option to terminate this contract after three months, by a registered letter to the effect that he elects not to use the process further. If this notice is not given, the license may, beginning with the third year of the contract, at any time upon six months' written

notice, be terminated by the Licensee. The Proprietor may also terminate the contract if the Licensee does not pay in any quarter year, beginning with the second year, $1500, or if the Licensee makes any unauthorized use of the process or assists others in so doing, or adopts any competitive process accomplishing substantially the same results. Upon termination for any cause no further use of the process shall be made by the Licensee and it will keep secret the information acquired and return any patent rights which may have been transferred to it, free of any charge to the Proprietor.

"Eighth: The Licensee shall have the right to sue any infringer of the patents on the process in its field at its own expense, in the name of the Proprietor or owner of the patents, if necessary, and the licensor agrees to execute any necessary papers for such suit."

The agreement was further amplified by a communication dated November 10, 1925, reading as follows:

"Hydroiloid, Incorporated,
"36 West 44th Street,
"New York, N. Y.
"Gentlemen:

"Referring to our agreement of November 9, 1925, we understand that the following representations are true:

"1. The treatment requires no extension or material change in our Fourdrinier machines.

"2. The treatment does not prevent giving to the paper the various finishes required as far as we know.

"3. All materials used in the treatment are at all times readily available and may be procured at a cost about the cost of sizing materials now used.

"4. The treatment requires no material change in machinery used for drying the paper in web or roll form for air drying.

"5. The treatment does not affect the durability of the paper adversely.

"6. The treatment does not use chemicals causing discoloration or oxidation of the papers.

"7. The treatment does not increase the ash content of the paper more than a good animal size.

"We also understand that the term "writing paper" used in the contract, and particularly in the paragraph entitled 'Territory and Uses,' refers to and includes all writing papers including ledgers, linens, bonds, bristols, writing tissues, papeteries and papers to be used for photographic mulsifying purposes.

"L. L. Brown Paper Company
"By   A. B. Daniels
"President

"We hereby agree that the agreement referred to above was made on the basis of the representations set forth herein and warrant that they are true.

"Hydroiloid, Incorporated
"By H. Scherbak
"H. Scherbak, Vice-President."

Mr. Scherbak took representatives of the Brown Company to a laboratory in New York and demonstrated the use of the secret process and then assisted the Brown Company in setting up the necessary machinery and equipment in its own plant at Adams, Mass.

By agreement dated April 29, 1926, the license issued by Hydroiloid to Brown was amended so that the fourth and seventh paragraphs were made to read as follows:

"Fourth: The Licensor, by this contract, grants to the Licensee the exclusive right to use the process referred to herein for the treatment of any and all rag content writing paper, and the exclusive right to use and sell such paper in the United States.

"Seventh: This contract may, beginning with the third year thereof, at any time, upon six months' written notice, be terminated by the Licensee. The Proprietor may also terminate the contract if the Licensee makes any unauthorized use of the process or assists others in so doing, or adopts any competitive process accomplishing substantially the same results, or if the Licensee does not pay, in any quarter year, beginning with the second year $1500. Upon the granting hereafter of the first sub-license in any field, as provided in paragraph 'Sixth', the above quarterly minimum shall be reduced to $1,000. Upon the granting of the second sub-license said quarterly minimum shall be reduced to $500. Upon the granting of the third sub-license the guaranteed minimum shall be removed entirely. Upon termination for any cause no further use of the process shall be made by the Licensee and it will keep secret the information acquired and return any patent rights which may have been transferred to it free of any charge to the Proprietor."

The Hydroiloid process is conceded to be an "after treatment".

During the first three years of operation under the license, petitioner obtained fairly successful results. Some complaints were made, and paper manufactured and sold by it was returned, principally because of discolorations attributed to chemicals employed. Petitioner experimented to find a way to eliminate the use of the objectionable chemicals and finally claims to have discovered that this could be accomplished by a treatment of the stock, that is, the pulp, by a process conceived by the petitioner and called and protected by a registered trade-mark "Resistall". This process is used before the paper is fed into the paper machine and the Hydroiloid process applied. Petitioner contends that the use of the "Resistall" process makes the paper more receptive to the Hydroiloid process and insures greater uniformity and better control.

In June, 1927, petitioner, through Lee, requested a modification of the license. Mr. Lee communicated this request to Mr. Scherbak in writing, of which the following is a copy:

"Interview Report
made by J. D. Lee, as Director
of the Hydroloid Inc.
"June 16, 1927.
"L. L. Brown Paper Company
A. B. Daniels, Pres.
"For our confidential information, he is working on a proposition with their best customer, the Irving Pitt Company, who are intending to use Hydroloid in large quantities for visible index cards. They have already ordered in ten lots and want to push the business in a large way. There is one hitch, however, and that is that they do not want to advertise the product under the name Hydroiloid. They fear that if Hydroiloid should come into general use their competitors would get the benefit of their advertising. Mr. Daniels said he had tried to convince them to the contrary but had not been successful. Mr. Daniels also thought that it might possibly have the same effect on his business if Hydroloid became generally used, not under our control. He said that he had no desire at the present time, however, to use any other name for his general Hydroloid product since they had put so much money into the advertising of Hydroloid. He said that of course he understood that if he sold paper to his customer under the name Hydroloid his customer could resell it under any name he wished but Mr. Daniels want to control any name which his customer may use so that he

alone can furnish the product for all time. He feared that it would not be carrying out his contract with us if he did this without our permission and asked that we think it over and let him know our disposition in the matter. J. D. L. promised to do this after consulting with Mr. Scherbak."

It was in 1927 that discord in the internal affairs of Hydroiloid Incorporated began to manifest itself. Ronald C. Lee had complained at a directors meeting on November 30th of the unfavorable financial status of the company. Mr. Scherbak withdrew from that meeting in anger and sailed for Germany on December 2nd. He left a power of attorney with Mr. R. J. Caldwell to represent him at subsequent meetings of the directors and stockholders. Of course, that did not authorize Mr. Caldwell to act in his stead as a director, but he did attend the meetings and was able to report whatever occurred to Scherbak who was thus kept informed at least to that extent.

The agreement of June 11, 1921, contained a clause which authorized the Parent Company to grant non-conflicting licenses to others provided the income from the American Company was less than $10,000 in any one year. Assuming to act under that provision the Parent Company on April 5, 1928, had notified Hydroiloid Incorporated that effective from April 2, 1928, non-competitive licenses had been granted to The Continuerliche Hollander System Mitchell G. M. B. H. of Berlin, another Scherbak controlled corporation.

Also in April, 1928, a minimum payment of $1,000 royalty became due from petitioner to Hydroiloid Incorporated, but was withheld because of the assignment proceedings.

The bill of sale from the assignee of Hydroiloid Incorporated to Ronald C. Lee was executed pursuant to an order of the New York Supreme Court on April 14, 1928, and included, inter alia, the contract dated June 11, 1921; U. S. Trade-mark No. 147017 (Hydroiloid); Lutz patent application Serial No. 456759, and subsequent applications made by Scherbak, all of which had been previously assigned to Hydroiloid Incorporated.

By reason of the acquisition of Hydroiloid Incorporated's assets, Lee demanded the payment by petitioner of the royalty to him. Petitioner knew of the previous assignment of 75% thereof by Hydroiloid Incorporated

to the Parent Company or Scherbak. In this dilemma petitioner paid $1,000 to Lee and also remitted $750 to the Parent Company, and then brought an action in one of the local New York courts against Lee to recover the payment made to him and requested the Parent Company and Scherbak to engage counsel and appear in that action so that it might be determined to whom petitioner should pay future royalties. Neither of them gave heed to the proposal and when the next quarterly payment was due, petitioner made payment to Lee upon his furnishing an indemnity bond.

In April, 1929, Lee verbally consented to a modification of the license agreement with petitioner authorizing the use of the registered name "Resistall". The change that was made in the license affected paragraph 5 by permitting the paper to be advertised under the word "Resistall" and omitting the use of either the word "Hydroil" or "Hydroiloid." About this time petitioner began to install improved machinery, adopted as a consequence of its experience, to effect a deeper penetration by the Hydroiloid Process, particularly of papers of increased thickness, and which also intensified the hardening of the surface of the paper. Petitioner claims not to have distinguished the "Resistall" process from the "Hydroiloid" process, conceding that the qualities of oil proof and wet-strong increased dry strength both as regards mullen or bursting strength and folding strength applied equally to each.

As early as 1929 petitioner distributed advertising matter containing the statement: "Resistall Linen Ledger is a 100% white rag paper which has been treated by means of an exclusive protected process" and test sheets upon which were printed: "Detach and immerse in water, rub with thumb while immersed and notice extreme resistance to abrasion. Dry it. Then place oil on it and note time required for penetration. If soiled, sponge it with soap and water and it is again like new!"

Lee protested to the Parent Company in November, 1929, against its violation of the agreement of June 11, 1921, by continuing offers of Hydroiloid Process and Hydroiloid papers in this country, and invited a suit to settle the questions in dispute. This letter was answered by Continuerliche Hollander, etc., and stated in part: "In our letters to American paper mills we always point out that we would place licenses only under the condition, that the mills take up the legal question with you. * * * No damage can be done in any case, as by our propaganda the American mills come to estimate the Hydroloid process as a very valuable one, so that you, in case you are the owner, would have only benefit."—and suggested it might be better from a financial point of view to reach an understanding.

Under date of March 14, 1930, the Parent Company wrote petitioner advising that samples of paper had been brought to its attention which Mr. Scherbak claimed petitioner was offering to the trade in Europe under the name "Resistall-Index-Board" and that investigation showed it was nothing else but Hydroiloid paper under another name, and inquired how it came about.

Petitioner replied April 12, 1930: "We have not offered our Hydroiloid or Resistall papers in foreign countries and if you have seen samples of them they evidently have been sent by some American firms."

It may, therefore, be assumed that the Parent Company and Scherbak had such notice at that time regarding the use by petitioner of the word "Resistall" to put them on inquiry.

As a matter of fact they retained Carrol S. Loeb, a New York attorney, through whom, after some negotiations, the adjustment of November 5, 1930, was brought about, and reference to its details must be made.

An agreement between Ronald C. Lee and Scherbak was executed on November 5, 1930. It refers to the license between petitioner and Hydroiloid Incorporated and the agreement by which the latter assumed to pay 75% of the royalties thereunder to Scherbak, who had constituted J. D. Lee as a trustee to collect and remit the royalties, less his commissions. Mr. Lee resigned this trusteeship on December 5, 1927.

The aforesaid agreement contains the following pertinent recitals:

"Whereas, heretofore Ronald C. Lee acquired the rights of Hydroiloid, Inc. in and under said license agreement, and

"Whereas, it is the desire and intention of the parties that hereafter Ronald C. Lee shall have an undivided one-half interest in said license contract and the payments accruing thereunder, and that Carrol S. Loeb shall have the other undivided one-half interest therein.

 *       *       *       *       *

"Herman Scherbak hereby confirms to Ronald C. Lee a one-half interest in and to

all the rights of said Hydroiloid, Inc., in and under said agreements, hereafter accruing, and hereby assigns to said Ronald C. Lee such interest therein as may be necessary to make the interest of said Ronald C. Lee one-half.

"Herman Scherbak and Ronald C. Lee hereby assign to Carrol S. Loeb the remaining one-half interest therein hereafter accruing.

"Ronald C. Lee represents that he has heretofore received from L. L. Brown Paper Company on account of royalties the sums of money on the dates shown in 'Exhibit A' hereto attached (aggregating $9000). Such payments are hereby ratified by Herman Scherbak, and shall be treated as if received by Scherbak to the extent of seventy-five per cent. thereof."

The second agreement, bearing the same date, between Ronald C. Lee, Joseph D. Lee and Herman Scherbak, and approved at the end thereof by the Parent Company, recites the exchange of general releases and, in confirmation of the adjustment of their differences heretofore existing between them, Ronald C. Lee declares that:

"He has received from L. L. Brown Paper Co., under the license agreement between that Company and Hydroiloid, Inc. the sums of money shown in Exhibit 'A' attached. Said sums are to be retained by said Ronald C. Lee free from any claims of Herman Scherbak, or any party claiming under him or under" the Parent Company.

"If Scherbak desires to bring an action for an accounting against L. L. Brown Paper Co. he shall deliver to Ronald C. Lee notice in writing of his intention so to do, together with a statement of any facts upon which he relies to sustain such action. Ronald C. Lee shall have a period of sixty days from the receipt of such notice and statement within which to elect to join in such action. If he elects to join in said action he shall bear one-half of the expense thereof and shall be entitled to one-half of the proceeds, if any. If he elects not to join in said action Scherbak, after the expiration of said sixty day period, shall have the right to prosecute such action alone, in which event he shall be entitled to the whole of the proceeds thereof, if any. Ronald C. Lee agrees to do such acts and execute such instruments as may be necessary in order to enable Scherbak to prosecute such action. It is agreed, however, that all payments heretofore made by L. L. Brown Paper Co.

to Ronald C. Lee shall for all purposes be treated as if received, to the extent of 75% thereof, by Scherbak."

The Lees represented that no negotiations were pending with anyone relative to the Hydroiloid patents and agreed to supply to Scherbak any information in their possession regarding negotiations theretofore subsisting and to keep confidential and not make use of any information in their possession regarding Hydroiloid processes and would undertake nothing detrimental or inimical to Scherbak's further developments and activities in the matter.

The releases received by the Lees in exchange for those delivered by them were executed by (a) Scherbak; (b) the Parent Company (c) Continuerliche Hollander, G. M.B.H. and (d) Deutsche Hydroloid, G.M. B.H.

Ronald C. and Joseph D. Lee resigned as directors and officers of Hydroiloid Incorporated and delivered to Scherbak all of its shares of stock held by either of them, and Ronald C. Lee executed and delivered an assignment of patent application, Serial No. 456759, to Carrol S. Loeb.

The fact that Scherbak reserved the right to investigate and determine whether there were any royalties which petitioner should have accounted for prior to November 5, 1930 and did not do so, and also the right to sue and collect them, is significant.

No action was ever brought by Scherbak, the Parent Company, or anyone claiming under either of them against the petitioner for an accounting, except the filing of the counterclaim in this action.

On April 15, 1931, Carrol S. Loeb and Ronald C. Lee addressed a communication to petitioner confirming an understanding embodied in a letter of April 10, 1931, addressed by it to Joseph D. Lee and his reply dated April 13, 1931, relating to the modification of the license agreement originally made between petitioner and Hydroiloid Incorporated, and requesting that all future payments of royalties be divided equally and sent to Loeb and Lee, respectively, together with duplicates of quarterly reports. This petitioner continued to do until May 24, 1933, when it purchased the one-half interest of Loeb (conceded to have been assigned to him as a means of payment of his fees for services rendered to the Scherbak respondents). Petitioner has ever since paid Ronald C. Lee his share of the

royalities up to the commencement of this action.

In 1933, petitioner distributed a catalogue of "Permanent Supremely Durable Record and Correspondence Papers" manufactured by it, in which, under the caption "Resistall Papers Defy Water, Oil and Wear", it was said: "Resistall is not an after treatment. The distinctive qualities which characterize it are built into the paper at an early point in the manufacturing process. Hence Resistall properties instead of being confined to the surfaces, penetrate the entire paper, thereby greatly increasing its resistance."

The Scherbak respondents claim this statement is untrue, at least in so far as the penetration of the entire paper is concerned. If so, that is a matter for the consideration of the Federal Trade Commission.

While the papers manufactured by the petitioner were advertised under the registered trade-name "Resistall", every package also bore the trade-mark "Hydroiloid".

As previously stated, Scherbak was not present at the adjustment of November 5, 1930; he arrived in this country within six weeks thereafter and returned to Europe early in 1931 and did not come to the United States again until 1933. Upon that visit he was in Washington, D. C., but not in New York City. He took no action then to investigate and protest petitioner's use of the "Resistall" process and trade-mark. In fact, he testified that from 1930 he made no inquiry about the petitioner as he thought "they would stick to the contract." He did not see either of the Lees from December 2nd, 1928, until July 13, 1934. The nature of that meeting is confirmed by a telegram which Scherbak sent to Lee two days later, reading as follows:

> "New York, N. Y.
> "July 16, 1934
>
> "Joseph Day Lee
> "Personal, Care Cravath Gersdorf
> "15 Broad Street, New York.
> "Repeat my verbal demand that contracts cash books patent files other technical and business documents are turned over to me stop Reserve all rights stop Your general release seems invalid as meeting not in accord with statutes stop I further request that Brown produces under the name Hydroiloid not Resistall stop Statute book incomplete
>
> "Hermann Scherbak
> "New York Athletic Club"

Scherbak had communicated with Lee once in the meantime to ask, in a letter dated August 13, 1932, for some information as to the officers, directors and records of Hydroiloid Incorporated, adding:

"If this letter will not be answered in every detail, I will address myself to L. L. Brown and to the Bar Association.

"You know very well that it is up to me whether L. L. Brown will go on paying minimum royalties or not."

To this letter Mr. Lee made a sarcastic reply and then conforming to a more polite response, gave the information requested.

In a letter dated January 28, 1935, Scherbak complained to petitioner that he had: "Just learned that your company is bringing out a paper of Hydroiloid quality under the trade name Resistall, and to protect the interests I represent, I beg to protest in any case against this violation of the contract of the ninth day of November, 1925 stating * * *; that all processed paper or products shall be sold under trade names which shall include the registered words Hydroil or Hydroloid."

Mr. Daniels, president of the petitioner, replied that he had been reliably informed that neither Scherbak, the Parent Company, nor Hydroiloid Incorporated had any interest in the license contract but was agreeable to a meeting in New York to discuss the matter.

Meanwhile Scherbak again wrote petitioner (February 12) that the rights for America to the Hydroiloid process was granted only for the life of Hydroiloid Incorporated, and since that company had been dissolved in 1933,—"All its rights to the patent are ended and the patent is returned".

He insisted that the sub-license had also terminated and that royalties paid to Lee since dissolution were "without reason" and pointed out: "The shortest way for remedy, also in view of Washington, would be to declare to Ronald C. Lee that the old contract is ended" and proposed the making of a new contract for which purpose "it would be advisable to use my presence in America to clear this matter."

Following a conference with Mr. Daniels, Scherbak addressed another letter (February 20, 1935) proposing that the license contract be rearranged and a claim of infringement against the United States Government be prosecuted. He wrote: "Even if we do not agree on a new license contract to follow up the claim against the government and to divide the proceeds half

and half and to divide the expenses the same way".

Following another conference with Mr. Daniels on February 27, 1935, Scherbak wrote petitioner:

"You informed me that you use the Hydroloid trade-mark in connection with your own trade-mark 'Resistall' according to contract."

"I indicated that it would be advisable that during my stay in America settlement would be reached in which my firm would give up its claims and enter your license in Washington against a share in the profits which you make out of Hydroloid. Further that we then could march together in our dealing with the Government Treasury for working out under our patent."

Mr. Daniels replied (March 2nd) challenging statements of fact alleged by Scherbak and again expressed a willingness "to sit down and settle this matter."

Scherbak wrote petitioner on March 26 expressing difficulty to set out a clear opinion regarding adjustment of contract situation because he had been advised of irregularities in the assignment proceedings in the New York Supreme Court and that "an entire new contract should be made and at the same time simplified" and "then be used as a base for an arrangement with the Treasury and for sub-license for those grades of paper, which are in the rag paper field, but are not manufactured by you."

Mr. Daniels pointed out in reply (April 1) that Scherbak had had ample opportunity to protect his rights and had confirmed Lee's title by the settlement of November 5, 1930.

The next development concerns an effort by Scherbak to negotiate a new license with the government, which required the consent of petitioner under its license of November 9, 1925. Mr. Daniels spoke with Lee about it. Respondents' Exhibit U reads as follows:

"Dear Mr. Daniels:

"In return for your consent given to me to issue a license to the U. S. Government to Hydroloid rag-content paper, I agree to assign to you 45% (forty-five percent) of all money received from the U. S. Government for such license. You will be prompt-ly informed and receive certified copy of the contract.

"H. Scherbak

"Washington, D. C. 17th July '35
"Approved:
"A. B. Daniels, President
"L. L. Brown Paper Company."

On the same day J. D. Lee wrote to Daniels: "When you asked me yesterday about the rights of my brother and myself in the event that another license should be made in the rag paper field, I told you that I had not given the matter consideration as the question had never arisen. I have now looked up the various contracts bearing on the point and it is my opinion that (1) the granting of such a license requires the consent of L. L. Brown and of my brother and myself; (2) the consent of Scherbak and/or Hydroloid Inc. is not required; and (3) of the proceeds of such other license L. L. Brown Paper Co. would be entitled to 70% and R. C. Lee and I would be entitled to 30% * * *"

Daniels wired Scherbak to that effect on July 19 and sent on a copy of Lee's letter, and advised Scherbak he regretted that "these matters have taken such a turn, which, of course, will cancel the memorandum agreement made with you on Tuesday evening in connection with these matters, and which was declined by the third party."

In this situation Scherbak expressed a divergence of views in a communication to Daniels dated July 20, 1935.

1. He contended that he had entered into the agreement of July 17, 1935, by the representation of Daniels that petitioner had acquired the interest of the Lees as well as Loeb in the license of November 9, 1925.

2. He asserted the contract of July 17 "does not come under the contract of Nov. 9, 1925."

3. He urged it was uncertain whether the contract of November 9, 1925, was still in force.

4. If it were, he insisted, no one could prevent petitioner from selling any part of its rights if Hydroiloid, Incorporated, did not object.

5. He wondered how Lee brothers could establish damages.

6. He proposed petitioner give them 5% of its share, and

7. Hoped Brown would do nothing to bring Lee into the picture.

An exchange of correspondence between Scherbak and Daniels continued during the month of August, 1935, but it is not regarded as of sufficient importance to particularize it.

It is a fact that Scherbak objected to the omission of any reference to "Hydroiloid" in petitioner's annual catalogue and a correction was made before the 1938 edition went to press by inserting after "Resistall"* (and at the bottom of that page) * "Hydroil Process" which appears to have been mutually agreeable.

May 12, 1938, the Swiss Company (by Scherbak) wrote petitioner: "You represented to the public in your 1937 catalogue and possibly in other ways not known to us that the Resistall process is a development of L. L. Brown experience, skill and technical research and may be applied to paper made by L. L. Brown Paper Company only."

Petitioner was further advised this was in violation of U. S. Letters Patent No. 1,682,390 and unless petitioner should cease and desist and make settlement for damages and loss of profits within 10 days suit for infringement would be commenced.

Two days later Hydroiloid Incorporated and the Swiss Company served upon petitioner, jointly, a notice of cancellation of the license contract of November 9, 1925, and the supplemental agreement of April 29, 1926, effective as of May 22nd, 1938, upon the following grounds:

"1. Failure to submit an accounting as provided for in paragraph marked 'Fifth'.

"2. Failure to make available and deliver to Hydroloid Inc. and its successors, full information and descriptions concerning certain improvements that you claim to have made as called for in paragraph 'Third'.

"3. Failure to abide your agreement not to adopt a competitive process accomplishing substantially the same results as provided in paragraph marked 'Seventh'.

"4. Suppression of trade mark Hydroloid in violation of provisions of paragraph marked 'Fifth'.

"5. Failure to deliver testimonials to Hydroloid Inc. as provided for in paragraph 'Third'.

"6. Publication of claims in contradiction of your express covenant contained in the last sentence of paragraph 'Third' thereof."

The contention of the Scherbak respondents is that when the Swiss corporation became the owner of the patent it took the same subject to petitioner's outstanding license with the correlative right of questioning the petitioner's proper discharge of its obligations thereunder since it is insisted the Swiss Company is the sole and complete proprietor of the patent, while the interest claimed by the petitioner and respondents Lee is a partial proprietory right which the patent laws do not recognize can exist independent of the patent.

■ Of course a patent is a statutory monopoly (Continental Paper Bag Co. v. Eastern Paper Bag Co. 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122), with a residual benefit to the public after the patent expires.

■ The right to make, use or vend an invention is a common-law right and a patent confers the right to exclude others.

■ A distinction must be made, however, between property, title or interest in a patent capable of assignment and the chief incident of that property, title or interest, an incident which can only pass by assignment when attached to the right to make, use and vend. Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24–44, 43 S.Ct. 254, 67 L.Ed. 516.

In other words, the government grants the incident of exclusive ownership of the common-law right.

Dealing with the question of patent assignments under the laws of the United States in Waterman v. Mackenzie, 138 U.S. 252, at page 255, 11 S.Ct. 334, at page 335, 34 L.Ed. 923, Mr. Justice Gray said: "The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign, grant, and convey, either (1) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive right; or (3) the exclusive right under the patent within and throughout a specified part of the United States. [Rev.Stat.] § 4898 [35 U.S.C.A. § 47]. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers. In the second case, jointly with the assignor. In the first and third cases, in the

868

name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. [Rev.Stat.] § 4919 [35 U.S.C.A. § 67]; Gayler v. Wilder, 10 How. 477, 494, 495 [13 L.Ed. 504]; Moore v. Marsh, 7 Wall. 515 [19 L.Ed. 37]."

The agreement dated June 11, 1921, obligated the Parent Company to assign to Lee Associates and by them in turn to Hydroiloid Incorporated, when incorporated, the secret process and the United States patent application covering the same. It contained the following clause: "If in any year after the first the party of the first part does not receive at least $10,000, the party of the first part may grant non-conflicting licenses to others."

It does not appear that any such reservation was made in the assignment itself. But, undoubtedly, the Parent Company could have compelled Lee Associates and Hydroiloid, or Ronald C. Lee, as the successor of the latter, to accord the Parent Company this right under the patent issued to him. As a matter of fact, the Parent Company attempted to issue a non-competitive license to Continuerliche Hollander, G.M.B.H., which conceded that the licenses to be granted by it to American mills were subject to the legal rights of Lee, but in the adjustment and settlement made November 5, 1930, Continuerliche Hollander, G.M.B.H., joined the Parent Company and Scherbak in the execution of general releases and all rights to royalties from the petitioner were waived. Indicating the intent of the parties to the agreement of June 11, 1921, a further condition was included whereby the Parent Company agreed: "To use its best efforts to prevent any and all foreign competition in the field of this contract and to prosecute any infringer or any violator of a license contract in said foreign countries at the request and expense" of Hydroiloid Incorporated.

■ From this it may be reasonably inferred that the parties regarded the assignment of the American rights and the application of the patent applied for and subsequently granted and issued in the name of Lee carried with it the right to sue for infringement in United States.

■■ An assignment transfers the monopoly as well as the invention and connotes the right to do the thing from which the patentee excludes others, Crown Co. v. Nye Tool Works, supra, while the license transfers only the invention and does not affect the monopoly otherwise than by estopping the licensor from exercising his prohibitory powers in derogation of the privileges conferred by him upon the licensee. The right of a patent owner to license the use of its patent is not a creature of statute, but of the common law. United States v. American Bell Telephone Co., C. C., 29 F. 17. A license is said to be merely the right not to be sued.

■ The claim of the petitioner is, therefore, based upon the common-law right under the terms of the license contract.

The Scherbak respondents further contend that the assignment of the patent by Lee to Loeb as their agent carried with it full title to and all interest in petitioner's license except the right to collect royalties payable thereunder. The very words of the agreement of November 5, 1930, set forth clearly the desire, purpose and intent of the parties that Ronald C. Lee "shall have an undivided one-half interest in said license contract and the payments accruing thereunder and that Carrol S. Loeb shall have the other undivided one-half interest therein."

Therefore, the monopoly of the Swiss Company, under the American patent is limited only by the exercise of the petitioner's use of the secret process in the manufacture of rag paper in accordance with the terms and conditions of its license.

■ The Scherbak respondents cannot be heard to complain that petitioner has not accounted to them. They have no interest in the royalties payable under the license and respondents Lee concede that petitioner has fully accounted to them.

■ The Scherbak respondents cannot be heard to complain of the alleged failure of the petitioner to make available and to deliver to Hydroiloid Incorporated and its successor full information and description concerning certain improvements pursuant to the third paragraph of the license agreement. Any such liability on the part of the petitioner was created by the license contract and not by virtue of the patent, and while the Swiss Company may have acquired from Scherbak all of the shares of the capital stock of Hydroiloid Incorporated (said by the Scherbak respondents to have been dissolved, however, in 1933)

the Swiss Company is not the successor in interest of the rights of Hydroiloid under the contract with the petitioner.

■ The Scherbak respondents cannot be heard to complain of the alleged failure of the petitioner not to adopt a competitive process as provided in paragraph seventh of the license contract. The proof does not establish that it is a competitive product. It is to be observed in this connection that Scherbak pointed out in his letter to petitioner dated January 28, 1935: "That all processed paper or products shall be sold under trade names which shall include the registered words 'Hydroil' or 'Hydroloid'".

That is precisely what the petitioner has done although relieved by Mr. Lee in 1929 when he was the owner of the patent as well as successor proprietor under the license agreement between Hydroiloid and petitioner from using the words "Hydroil" or "Hydroiloid" exclusively.

The petitioner has not, therefore, suppressed the trade-mark "Hydroiloid" in violation of the provisions of paragraph "Fifth" of the license contract, but was permitted to substitute "Resistall" for "Hydroiloid".

■ Scherbak knew of this as early as 1930. The first objection he made was in 1935, but he did nothing more until 1938 when the petitioner made a change, as requested by Scherbak, in his catalogue for that year on the very eve of the attempted cancellation of the license contract by the Scherbak respondents.

Upon the doctrine of laches and the implication of equitable estoppel upon which it is based, the Scherbak respondents should not prevail.

It is not unlikely that had Scherbak made the inquiry expected of a reasonably prudent person at the time of the settlement of November 5, 1930, a full accord could also have been reached with respect to the petitioner's use of the trade-mark "Resistall". It does not seem equitable that with his knowledge of a claimed invasion of right he should await his own pleasure and convenience, meanwhile permitting and encouraging the petitioner to build up a substantial business on the dual use of the two secret processes and the registered trade-names, and then be permitted to destroy it with the aid of a court decree.

The license contract is still in force. There has been no infringement of the letters patent by the petitioner and no legal claim has been established for damages. Neither have the defendants Lee established any basis of a legal claim upon which a reference to a master should be made.

Submit suggested findings of fact and conclusions of law, and when these have been disposed of by the court a decree may be entered in accordance therewith sustaining the petition and dismissing the counterclaims.